**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| RYAN DARCY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE CHEMOURS COMPANY, DENISE DIGNAM, and SHANE HOSTETTER,<br><br>Defendants. | **Case No.**<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Ryan Darcy ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding The Chemours Company ("Chemours" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Chemours securities between February 20, 2026 and August 4, 2026, both dates inclusive (the "Class Period"), seeking

to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Chemours offers a range of industrial and specialty chemical products for markets including, as relevant here, refrigeration and air conditioning. Chemours reports financial results from its sales of such products, including Opteon™, a set of refrigeration chemicals with a "near-zero ozone-depletion footprint", in its Thermal & Specialized Solutions ("TSS") segment.

3. In December 2020, the U.S. Congress enacted the American Innovation and Manufacturing Act ("U.S. AIM Act"), which directed the U.S. Environmental Protection Agency to reduce the human impact on climate change by overseeing the transition to alternative refrigerants that present a lesser impact to the ozone layer than legacy refrigerants.

4. At all relevant times, Defendants represented to investors that "[g]rowth in our Thermal & Specialized Solutions segment is supported in part by the adoption of the [U.S. AIM Act] in the U.S."

5. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had materially overstated aftermarket demand for their Opteon products; (ii) demand for such products was decreasing as a result of Defendants' overselling Opteon products in the preceding fiscal year; (iii) as a result of these undisclosed issues, Defendants' financial guidance for the 2026 fiscal year was unreliable; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6. On August 4, 2026, after market hours, Chemours announced second quarter 2026 financial results. Among other things, the Company reduced its adjusted EBITDA full-year guidance to $775 million to $825 million (from $800 million to $900 million previously). Further, in the accompanying earnings call, management admitted that "[a]s a result of the initial channel fill, aftermarket customers built additional inventory, creating an oversupplied channel heading into 2026." Management further disclosed "from the Q2 and Q3 perspective, there's probably about $65 million of aftermarket sales that realistically, you think about like-for-like probably should have been allocated to more of this year."

7. On this news, Chemours's stock price fell $3.34 per share, or 18.63%, to close at $14.59 per share on August 5, 2026.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Chemours is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

12. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

13. Plaintiff, as set forth in the attached Certification, acquired Chemours securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14. Defendant Chemours is incorporated in Delaware with principal executive offices located at 1007 Market Street, Wilmington, Delaware 19801. The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "CC".

15. Defendant Denise Dignam ("Dignam") has served as Chemours's President and Chief Executive Officer at all relevant times.

16. Defendant Shane Hostetter ("Hostetter") has served as Chemours's Senior Vice President and Chief Financial Officer at all relevant times.

17. Defendants Dignam and Hostetter are collectively referred to herein as the "Individual Defendants."

18. The Individual Defendants possessed the power and authority to control the contents of Chemours's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Chemours's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions

with Chemours, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

19. Chemours and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20. Chemours offers a range of industrial and specialty chemical products for markets including, as relevant here, refrigeration and air conditioning. Chemours reports financial results from its sales of such products, including Opteon™, a set of refrigeration chemicals with a "near-zero ozone-depletion footprint", in its TSS segment.

21. In December 2020, the U.S. Congress enacted the U.S. AIM Act, which directed the U.S. Environmental Protection Agency to reduce the human impact on climate change by overseeing the transition to alternative refrigerants that present a lesser impact to the ozone layer than legacy refrigerants.

22. At all relevant times, Defendants represented to investors that "[g]rowth in our Thermal & Specialized Solutions segment is supported in part by the adoption of the [U.S. AIM Act] in the U.S."

### Materially False and Misleading Statements Issued During the Class Period

23. The Class Period begins on February 20, 2026, the day after Chemours issued a press release announcing its financial results for the quarter and year ended December 31, 2025

hosted a conference call to discuss the same (the "FY 2025 Earnings Call"). In that day's press release, Chemours boasted that "TSS report[ed] a record fourth quarter with double-digit year-over-year growth of 37% in Opteon™ Refrigerants", and reported its expected adjusted EBITDA "to range between $120 and $150 million" for the first quarter of 2026, and "between $800 and $900 million" for the full year.

24. During the FY 2025 Earnings Call, Defendant Dignam touted the Company's performance and specifically lauded its "fourth quarter record for Opteon sales" driven "primarily [by] higher pricing and moderate volume increases, supported by a favorable mix for Opteon Refrigerant blends driven by the U.S. AIM Acts residential HVAC equipment transition", stating in relevant part[1]:

> ***Net sales met expectations largely due to TSS achieving record sales driven by continued strong Opteon adoption*** and consistent commercial performance across all divisions. . . . With this background, I'd like to provide some additional context on our business level performance. ***Our TSS business reported a fourth quarter record for Opteon sales with double-digit growth of 37% compared to the prior year quarter, in line with our expectations. Overall, TSS' top line increase was primarily due to higher pricing and moderate volume increases, supported by a favorable mix for Opteon Refrigerant blends driven by the U.S. AIM Acts residential HVAC equipment transition*** and opportunistic sales for certain Freon Refrigerants. This could not have been achieved without the TSS team's excellent commercial execution, which resulted in new sales opportunities and efficient use of our quota allowances.

25. Later during the FY 2025 Earnings Call, Defendant Hostetter stated that Defendants expected improved sequential performance in the first quarter of 2026, due in part to "continued growth in Opteon Refrigerants . . . expected to be driven by the continued regulatory adoption associated with governmental mandates under the U.S. AIM Act", stating in relevant part:

> I now would like to discuss our expectations for the first quarter and factors that will drive our business as we look ahead.

[1] All emphases herein are added unless otherwise indicated.

> Beginning with TSS. For the first quarter, we project net sales to rise sequentially in the mid-20s to 30% range, primarily attributable to favorable seasonal trends and continued growth in Opteon Refrigerants, where we are also forecasting a sequential increase of 30% to 40% in the first quarter. ***This sustained double-digit Opteon Refrigerant expansion is expected to be driven by the continued regulatory adoption associated with government mandates under the U.S. AIM Act***.

26. Defendant Hostetter also stated that Defendants expected this improved performance in Opteon Refrigerants to persist through the year, and specifically "to continue into the second quarter of 2026" even as Defendants expected performance in this segment would "begin to normalize . . . in the second half of the year as year-over-year comparison points will reflect the regulatory-driven market demand we saw in late 2025", stating in relevant part:

> Adjusted EBITDA for TSS is also anticipated to grow sequentially, ranging from $170 million to $185 million, also driven by seasonality and the continued transition to our Opteon stationary refrigerants. ***As we look beyond the first quarter, we expect year-over-year double-digit growth for Opteon Refrigerants to continue into the second quarter of 2026, but will then begin to normalize*** to more typical seasonal patterns ***in the second half of the year as year-over-year comparison points will reflect the regulatory-driven market demand we saw in late 2025.***

27. Also during his prepared remarks on the FY 2025 Earnings Call, Defendant Hostetter shared Defendants' expectations of Chemours's performance for the 2026 fiscal year, including "overall net sales growth to be between 3% and 5% and adjusted EBITDA to range from $800 million to $900 million".

28. During the question-and-answer portion of the FY 2025 Earnings Call, when an analyst asked about Defendants' adjusted EBITDA midpoint guidance of $135 million for the first quarter of 2026 and $800 million for the full fiscal year, and "how [Defendants] plan to see that uplift from, say, the $135 million to maybe a $200 million number or so for the middle of the year", Defendant Dignam specifically reaffirmed Defendants' adjusted EBITDA guidance, stating

in relevant part: "***We have full confidence in our full year guide. As I said in the prepared comments, we expect earnings growth in all 3 of our businesses.***"

29. Defendant Dignam also prompted Defendant Hostetter to provide a more detailed response to this question. Defendant Hostetter explained that the first quarter of 2026 would enjoy some favorable comparisons given one-off events in the first quarter of 2025, and that "***[i]t's really strengths in our refrigerants and Opteon business***" which drove Defendants' expectations, stating in relevant part:

> [Y]ou got the midpoints right in Q1 and year-end guides and then you really -- as we look at Q2, right, ***just thinking through what happened in Q1, we are looking at low ranges of 0% to 5% in [Titanium Technologies ("TT")] and [Advanced Performance Materials ("APM")] that is inclusive of some, what I'll call, unusual items specific to APM***, we had the Washington Works outage of roughly $20 million to $25 million of an impact. And then for TT, we had roughly $17 million of inventory and really mix areas around the ore. So as you think about that with the midpoint of the guide in the first quarter, the $40 million in addition to that onetime it's going into next year or going into the second quarter, it's a good start.
>
> Then as you pointed out, it's really seasonality. ***It's really strength in our refrigerants and Opteon business.*** It's getting the price in the fact that Denise had earlier talked about in TT and continuing that momentum as well as pricing over TSS. ***And we're going to continue to control what we can control across each one of our businesses*** and getting cost out across on that side, which is going to progress as the year goes on as well.

30. Later, an analyst asked "what you expect on [the Freon] side of the business without the [U.S. AIM Act] transition happening this year". Defendant Hostetter affirmed Defendants' expectations even in the absences of the U.S. AIM Act transition, stating in relevant part:

> We're pretty happy with some of the tailwinds we saw in the fourth quarter related to the Freon business. ***As we look ahead***, in my script, ***I mentioned really thinking through the tailings of pricing around both Opteon and Freon, and we can look at '26 and see that continuing***. So we're really proud of both the execution on the Opteon side and Freon side in '25, and ***we'll continue to execute and grow in both next year***.

31. On May 5, 2026, Chemours issued a press release announcing its financial results for the first quarter of 2026, including net sales of $1.4 billion "with TSS reporting record first-quarter results, with continued double-digit year-over-year growth in Opteon™ Refrigerants" and adjusted EBITDA of $169 million. Chemours also reaffirmed its adjusted EBITDA expectations for the full fiscal year, in part due to "***higher TSS . . . demand***", stating in relevant part:

> The Company continues to expect 2026 Net Sales to grow in the range of 3% to 5% over 2025, with Adjusted EBITDA between $800 million and $900 million. ***This outlook is supported by higher TSS*** and APM Performance Solutions ***demand***, anticipated TT pricing momentum, and ongoing cost improvements in each business.

32. On May 7, 2025, Chemours held a conference call to discuss its financial results for the second quarter of 2026 (the "Q1 Earnings Call"). During her prepared remarks on that call, Defendant Dignam discussed the Company's positive quarterly results, including "standout performance[]" from its TSS segment that was driven by "higher pricing" which "benefitted" in part "from automotive aftermarket . . . Opteon blends", stating in relevant part:

> We started 2026 with strong results, delivering a first quarter that was well above earnings expectations and showcased the strength of Chemours' disciplined execution and strategic focus across the company. Both ***Thermal & Specialized Solutions*** and Titanium Technologies ***delivered standout performances with TSS not only achieving another quarter of double-digit year-over-year growth in Opteon Refrigerants***, but also excelling in quota execution and capturing additional opportunities in Freon Refrigerants through sharp market focus and agile commercial execution. . . . Net sales for TSS increased 22% versus the prior year quarter, largely driven by higher pricing, stronger volume growth and a favorable product mix across refrigerant markets. ***Pricing benefited from automotive aftermarket*** Freon Refrigerants sales in North America and ***Opteon blends***, while overall volume growth was supported by seasonal strength.

33. During his prepared remarks, Defendant Hostetter discussed Defendants' expectations that the TSS segment would continue to improve in the second quarter of 2026, "underpinned by strength across our Opteon and Freon Refrigerants channels", stating in relevant part:

> Beginning with TSS. ***For the second quarter, we project net sales to rise sequentially in the low to mid-teens percent range***, primarily attributable to favorable seasonal trends related to the cooling season in the Northern Hemisphere. It is worth noting that some demand and associated sales having about a $10 million impact on adjusted EBITDA was pulled forward into the first quarter due to timing, which modestly tempers the sequential progression we would have otherwise expected and added strength to our first quarter TSS performance. ***Despite this pull forward, the seasonal uplift we anticipate for TSS will be underpinned by strength across our Opteon and Freon Refrigerants channels***. ***Adjusted EBITDA for TSS is also expected to grow sequentially***, ranging from $210 million to $225 million, ***primarily driven by*** seasonality as well as specific opportunities our commercial team is capturing in the Freon aftermarket and ***continued transition to Opteon Refrigerants***.

34. Defendant Hostetter reaffirmed Defendants' "bullish" outlook for the remainder of the year despite unfavorable comparisons to analogous quarters of 2025, given the impact of the U.S. AIM Act that year, stating in relevant part:

> While we do not expect the same year-over-year double-digit top line growth for the remainder of 2026 as comparisons begin to reflect the regulatory-driven adoption under the U.S. AIM Act that drove robust demand in late 2025, ***we remain bullish on the opportunity ahead as we allocate our quota to achieve optimal profitability***.

35. Defendant Hostetter also specifically reaffirmed Defendants' previously announced annual guidance, including adjusted EBITDA, stating in relevant part:

> Turning to the full year. Despite a mixed global operating environment that includes challenging commercial end markets and overall raw material and other cost inflation, we still expect our full year consolidated net sales, adjusted EBITDA and capital expenditure forecast to align with our previous guidance.

36. When an analyst asked Defendants how they anticipated achieving their reaffirmed full year EBITDA guidance, Defendant Dignam stated that Defendants "remain very optimistic on [year-over-year] growth", given "very strong pricing" and "stable volume", stating in relevant part:

> I'll just start by saying coming into 2026, we were very optimistic on growth 2025 to 2026, and ***we remain very optimistic on that growth***. When you think about pricing, ***we have very strong pricing***. When you think about volume, ***we see very stable volume*** and our cost actions are really working. So we feel good about the growth year-over-year . . . .

37. Later, when another analyst specifically asked Defendants about their expectations for the TSS segment in the absence of the U.S. AIM Act transition, Defendant Dignam reaffirmed Defendants' expectation that the segment would see growth given their "really, really strong position in the aftermarket", stating in relevant part:

> [F]irst of all, ***we still expect year-over-year growth in Opteon and in TSS***. As we get to the second half of the year, you're going to see more of a slowdown as we've talked about, because of the transition. ***But we see a lot of upside in the aftermarket as new equipment gets installed, and we have a really, really strong position in the aftermarket***. When you think about Freon, as I said earlier, we see stickiness in our pricing and in our volumes because of our position in the auto aftermarket. ***So we feel very optimistic about the growth and our position for the rest of the year***.

38. The statements referenced in ¶¶ 24–38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had materially overstated aftermarket demand for their Opteon products; (ii) demand for such products decreased as a result of Defendants' overselling Opteon products in the preceding fiscal year; (iii) as a result of these undisclosed issues, Defendants' financial guidance for the 2026 fiscal year was unreliable; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**<u>The Truth Emerges</u>**

39. On August 4, 2026, after market hours, Chemours announced second quarter 2026 financial results. Among other things, the Company reduced its adjusted EBITDA full-year guidance to $775 million to $825 million (from $800 million to $900 million previously) and reported net sales of $1.6 billion, a year-over-year decrease of approximately 1%, which the

Company attributed to "a 4% decrease in volumes". Chemours explicitly connected its decrease in net sales to and unfavorable "compar[ison] with elevated demand . . . driven by the initial aftermarket channel fill associated with stationary technology AC transition under the U.S. AIM Act", stating in relevant part:

> ***The volume decline was primarily driven by lower TSS Opteon™ blends aftermarket refrigerant sales***, compared with elevated demand in Q2 2025 ***driven by the initial aftermarket channel fill associated with stationary technology AC transition under the U.S. AIM Act***, as well as lower volumes associated with the APM SPS Capstone™ line closure completed in the third quarter of 2025.

40. Further, in the accompanying earnings call on the morning of August 5, 2026, departing from her representation that Chemours enjoyed "a really, really strong position in the aftermarket" during the Q1 Earnings Call, Defendant Dignam reaffirmed the connection between the Company's decrease in net sales and its "initial aftermarket channel fill associated with . . . the U.S. AIM Act" and the "result[ing ] initial channel fill", stating in relevant part:

> ***Net sales were slightly down versus the prior year quarter, driven by lower volumes from reduced aftermarket sales of Opteon blend in North America***, while Opteon OEM volumes saw growth year-over-year in addition to continued growth into data center end markets. In the second quarter, that volume pressure was partially offset by higher pricing supported by strength in Freon refrigerants, primarily in automotive applications.
>
> ***It's important to note that the prior year quarter benefited from advanced demand tied to the initial aftermarket channel fill associated with the stationary AC transition under the U.S. AIM Act***. Given our advantaged position in the market, Chemours moved quickly to help ensure distributors and technicians were well supplied to support the new equipment installations. ***As a result of the initial channel fill, aftermarket customers built additional inventory, creating an oversupplied channel heading into 2026***.

41. In response to an analyst's question, Defendant Hostetter quantified the initial aftermarket channel fill's impact on the Company's projected performance for the third quarter of 2026, stating in relevant part:

> As we think about quantifying how much it's down, last year, you might recall, we had a really sizable sales into the aftermarket given the transition under the AIM

> Act. ***We believe from the Q2 and Q3 perspective, there's probably about $65 million of aftermarket sales that realistically, you think about like-for-like probably should have been allocated to more of this year***. ***It was just more prebuy given some of the overall inventory constraints in the market that we took advantage of in supply***. So like-for-like, I think if you look at Q2, Q3 comparatively year-over-year, there's probably about a $65 million balance.

42. On this news, Chemours's stock price fell $3.34 per share, or 18.63%, to close at $14.59 per share on August 5, 2026.

43. Following Defendants' revelations, several analysts lowered their respective price targets for Chemours's stock. For example, on August 10, 2026, UBS downgraded Chemours's stock from Buy to Neutral and reduced its price target 37.9%, from $29 to $18, citing "questions around the right level of earnings of Chemours' refrigerant business (TSS) following larger destocking" and its "analysis indicat[ing] that Chemours did oversell products in 2025 and likely early 2026 . . ." Also on August 10, 2026, Morgan Stanley reduced its price target 14.3%, from $21 to $18, citing "an unexpected guidance cut and a material change in EBITDA mix . . . away from the higher multiple TSS segment" which would "rebase lower on account of destocking in the aftermarket channel (a source of significant demand in 2025) as well as a weak HVAC market." On August 13, 2026, J.P Morgan reduced its price target 31.8%, from $22 to $15, writing that Chemours's "revenue contraction in [its] 2Q:26 [TSS] segment was a surprise to the market" and "represented a downward adjustment to Chermours' own expectation for Opteon's performance in 2026."

44. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

45. During the Class Period, Defendants had both the motive and opportunity to commit fraud. ***During the Class Period, the Individual Defendants enriched themselves by selling 26,671 shares of Chemours common stock for over $485,000 in proceeds***. Defendant Dignam sold 23,439 shares of Chemours common stock for $426,876 in proceeds, while Defendant Hostetter sold 3,232 shares of Chemours common stock for $58,951.70 in proceeds.

46. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Defendants repeatedly spoke to Chemours' purported strength in aftermarket Opteon sales, as alleged *supra* ¶¶ 33, 38, their understanding of the market's demand for Opteon products as alleged *supra* ¶¶ 31–32, and their confidence in their annual guidance, as alleged *supra* ¶¶ 29, 35–37. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

47. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Chemours securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Chemours securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Chemours or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chemours;
- whether the Individual Defendants caused Chemours to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Chemours securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

53. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Chemours securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Chemours securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

54. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

56. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

57. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Chemours securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Chemours securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

59. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Chemours securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Chemours's finances and business prospects.

60. By virtue of their positions at Chemours, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

61. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Chemours, the Individual Defendants had knowledge of the details of Chemours's internal affairs.

62. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Chemours. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Chemours's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Chemours securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Chemours's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Chemours securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

63. During the Class Period, Chemours securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Chemours securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Chemours securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Chemours securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

64. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

66. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67. During the Class Period, the Individual Defendants participated in the operation and management of Chemours, and conducted and participated, directly and indirectly, in the conduct of Chemours's business affairs. Because of their senior positions, they knew the adverse non-public information about Chemours's misstatement of income and expenses and false financial statements.

68. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Chemours's financial condition and results of operations, and to correct promptly any public statements issued by Chemours which had become materially false or misleading.

69. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Chemours disseminated in the marketplace during the Class Period concerning Chemours's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Chemours to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Chemours within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Chemours securities.

70. Each of the Individual Defendants, therefore, acted as a controlling person of Chemours. By reason of their senior management positions and/or being directors of Chemours, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Chemours to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Chemours and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

71. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chemours.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: October 8, 2026

Respectfully submitted,

BIELLI & KLAUDER, LLC

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
rernst@bk-legal.com

POMERANTZ LLP
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

**Pro hac vice* application forthcoming